IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**LARRY L. HILLS,**

Plaintiff,

v.

**COMMISSIONER,**
**SOCIAL SECURITY ADMINISTRATION,**

Defendant.

Case No. 6:14-cv-01614-CL

**REPORT and**
**RECOMMENDATION**

MARK D. CLARKE, Magistrate Judge.

Plaintiff Larry L. Hills ("Plaintiff") seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application for

Disability Insurance Benefits ("DBI") under Title II of the Social Security Act. This court has

jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). Because the Commissioner's decision is not

supported by substantial evidence, it should be **REVERSED** and **REMANDED** for the calculation and award of benefits.

## BACKGROUND

Plaintiff was born in 1951, and was 59 years old on the alleged onset date of disability. He completed a GED and some college classes . Tr. 44. He has past relevant work as a cook, dishwasher, and laborer. Tr. 147

Plaintiff protectively filed an application for disability insurance on April 20 , 2011, alleging disability since June 1, 2002, due to "pain, Bipolar, mental health conditions, diabetes." Tr. 247. The Commissioner denied his application initially and upon reconsideration. Tr. 101-04, 110-12. At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on February 27, 2013. Tr. 33-90. At the hearing Plaintiff amended his onset date to April 7, 2011. Tr. 37. On June 13, 2013, the ALJ found Plaintiff not disabled. Tr. 16-27. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision Tr. 1-4. Plaintiff now seeks judicial review of that decision.

## DISABILITY ANALYSIS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. § 416.920(SSI); *Bowen v. Yuckert,*

482 U.S. 137, 140 (1987). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4). The five-step sequential process asks the following series of questions:

1.  Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(I). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.  Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). Unless expected to result in death, an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a); 416.921(a). This impairment must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509; 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.  Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis proceeds beyond step three. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e); 404.1545(b)-(c); 416.920(e); 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.  Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.  Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in

> significant numbers in the national economy? If so, then the claimant is
> not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v); 404.1560(c);
> 416.960(c). If the claimant cannot perform such work, he or she is
> disabled. *Id.*

*See also Bustamante v. Massanari,* 262. F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also*

*Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999); *Yuckert,* 482 U.S. at 140-41. The

Commissioner bears the burden of proof at step five. *Tackett,* 180 F.3d at 1100. At step five, the

Commissioner must show that the claimant can perform other work that exists in significant numbers

in the national economy, "taking into consideration the claimant's residual functional

capacity, age, education, and work experience." *Id.; see also* 20 C.F.R. §§ 404.1566; 416.966

(describing "work which exists in the national economy"). If the Commissioner fails to meet this

burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however,

the Commissioner proves that the claimant is able to perform other work existing in significant

numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54;

*Tackett,* 180 F.3d at 1099.

## THE ALJ'S FINDINGS

The ALJ applied the sequential process. At step one, the ALJ found Plaintiff has not engaged

in substantial gainful activity from the amended alleged onset date of April 7, 2011. Tr. 18 . At step

two, the ALJ found Plaintiff's anxiety disorder, dysthymic disorder, bipolar disorder, somatoform

disorder, cannabis abuse, alcohol abuse in partial remission, personality disorder, not otherwise

specified, diabetes mellitus, and seizure disorder were severe impairments. *Id.* At step three, the

ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the specific impairments listed in the regulations.

The ALJ determined that Plaintiff had the RFC to perform medium work, and can lift and carry fifty pounds occasionally and twenty five pounds frequently; stand and walk six hours of an eight-hour workday; sit six hours of an eight-hour workday; and can perform simple routine tasks. He cannot work at heights or around dangerous machinery. Tr. 20. In reaching his conclusion, the ALJ considered Plaintiff's testimony, but found him not fully credible. Tr. 21. At step four, the ALJ found Plaintiff able to perform past relevant work as a dishwasher. Tr. 27. Therefore, the ALJ concluded Plaintiff had not been under a disability, as defined by the Social Security Act, through June 13, 2013.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009)(quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Id.*

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this court may not substitute its judgment for that of the

Commissioner. *Id.* "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007)(quoting *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006)(internal quotations omitted)). The reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Id.; see also Bray,* 554 F.3d at 1226.

Even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Flake v. Gardner,* 399 F.2d 532, 540 (9th Cir. 1968). Under sentence four of 42 U.S.C. § 405(g), the court has the power to enter, upon the pleadings and transcript record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing.

## ADMINISTRATIVE RECORD

### I. Testimony

Plaintiff, his attorney, and a Vocational Expert appeared at a hearing before an ALJ on February 27, 2013. Tr. 33-90. Plaintiff testified that he was 61 years old and divorced. Tr. 38. He was living in a travel trailer for the past seven or eight months. Tr. 39. Prior to acquiring the trailer he was homeless. He received food stamps and the Oregon Health Plan. Tr. 41-42. He joined the Army in 1972 but was discharged within 60 days because of his seizure disorder.

Plaintiff was convicted of burglary, robbery, and kidnapping in 1986 and was incarcerated for seven years. Tr. 42. In 1995 he was convicted of domestic violence and served six months. Tr. 43. Plaintiff completed the ninth grade, obtained his GED, and completed some college credits. Tr.

44. He last worked as a cook in 2002. Tr. 45. He was fired from a dishwashing job and a job in a

deli when he failed to show up for work for three days because he had a headache. Tr. 49.

Asked why he cannot work, Plaintiff responded that he cannot concentrate, he gets

headaches, and "I have trouble with the depression a lot....I don't know what to say really. I'm just

– I have really a hard time concentrating." *Id.* He has stress and anxiety attacks.

He liked washing dishes because "you didn't have to concentrate at it." Tr. 50. Plaintiff

stated he cannot go back to dishwashing because he would miss too much work and he would be

fired. On a bad day he may have two headaches, in a good month he might have two. The

headaches last a couple of days. Tr. 51. He does not take medication for the headaches because he

is afraid of addictive pain medication. *Id.*

He gets migraine headaches as well as tension headaches. Plaintiff is familiar with

medications that might prevent a migraine, but they are not covered by his health insurance. Tr. 52.

He does not always know when he is going to get a headache. He smokes marijuana about three

times a week and that helps his headaches. Tr. 53. He volunteers as a care provider and provides

marijuana to one person, who allows him to keep a little bit. He uses the bus for travel, and delivers

marijuana about once a week. It takes a couple of hours. Plaintiff's marijuana is worth \$10 to \$20

per week. He does not know if it is legal for him to be paid in cash instead of marijuana. Tr. 57.

Plaintiff keeps a bus pass "because if I sit at home too long the depression really sets in a lot."

Tr. 58. He tries to get out of the house "try to go do something, you know, try, you know, try to do

something, go fishing or something, anything, you know, just try to keep moving." *Id.* He has some

problems with his hip which would not prevent him from washing dishes, "but the headaches and

everything else, you know, put together it's made it hard to keep a job." Tr. 59. He has had about

four beers in the last four months. *Id.* Anxiety affects his ability to work because when he becomes stressed he "leave[s] the situation." Tr. 60. When he starts feeling a panic attack he has "got to get away." Tr. 61. Plaintiff takes six medications, but he does not know if one of them is for anxiety. Depression affects his ability to work:

> In a depression it's, oh, man, it just, you know, you get deep depression here last year I decided, for example, I decided that I was going to kill myself on July 26th. I did not know why that day this was in May when I decided to kill myself on July 26th. I decided it was going to be a wonderful day to die and I changed my mind when I found out it wasn't a Thursday. I don't know why, but I had trouble with my daughter up in Washington.

Tr. 62.

Plaintiff testified he inherited $97,000 at the beginning of the year when his mother passed away, and it was all gone. Tr. 62. He gave some of the money to other people. Tr. 63. He used some of the money to buy the travel trailer in which he lives.

Plaintiff stated he took pain pills in the 1960s and 1970s for his headaches and they almost killed him. He prefers marijuana because it is natural and works better than pain medication. Tr.65. Pain medication "messes with your head, and I don't want my head to be fuddled. I got enough troubles with my head being befuddled without taking a bunch of pain pills." *Id.*

He walks to the grocery store nearly daily, and does his own housework, cooking, and laundry. Tr. 66. He listens to music, watches television about two hours daily, and uses a computer to visit Facebook. He uses the computer about two hours a day. He has "some good friends that I like to go see." Tr. 68, 74. He washes dishes four or five times a day for about 20 minutes each, and cooks for about an hour at least once a day.

Plaintiff stated he has been successful at staying out of jail and "got lucky. I managed the outside but it's hard, you know." Tr. 72. He wants to stay straight and "help people now instead of hurting them and I think I've been doing that for quite a while now." *Id.* He gave some of his inheritance to a homeless friend and the friend's family.

Stress causes his headaches to be worse. Maintaining a work pace and coworkers can be stressful. Tr. 77. He has neuropathy in his left foot that does not affect his ability to stand or walk. Tr. 80. His moods cycle between suicidal ideation and feeling like Superman. Tr. 81. The depressed mood will last a couple of days, and the euphoric mood will last about one day. The cycles occur about five or six times a month. He is not good with money, and thought if he were to receive benefits he should have a payee. Tr. 84.

## II. Medical Records

The medical records are extensive, and the parties are familiar with them. Therefore they will be set out below when relevant.

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) finding him less than fully credible; (2) improperly weighing medical evidence; and (3) failing to properly evaluate impairments arising from headaches.

## I. Credibility

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue,* 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could

reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater,* 80 F.3d 1273, 1282 (9th Circ. 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, '" the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter,* 504 F.3d at 1036 (quoting *Smolen,* 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir. 1995)(citing *Bunnell v. Sullivan,* 947 F.2d 341, 345-46 (9th Cir. 1991)(*en banc*)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen,* 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than

treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may consider...ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms...other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen,* 80 F.3d at 1284.

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. Tr. 21, 23. The ALJ gave several specific reasons for this determination. Plaintiff contends they are neither clear nor convincing.

Plaintiff contends that it was inconsistent for the ALJ to find somatoform and personality disorders severe at step two and to find Plaintiff not credible regarding his allegations of symptoms. This argument fails because the ALJ offered several other reasons to find Plaintiff less than fully credible. The ALJ cited treatment records inconsistent with Plaintiff's allegations, medical evidence that did not contain objective evidence to support Plaintiff's claims, activities of daily living inconsistent with Plaintiff's claims, and significant criminal history. Tr. 21-24. Plaintiff has not challenged any of those reasons. Accordingly, the ALJ's credibility determination is supported by substantial evidence and should be upheld.

**II. Medical Evidence**

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord

greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn,* 495 F.3d at 632. In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart,* 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The opinion of an nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F.3d at 1066 n. 2. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005).

### A. Nick Dietlein, Psy. D.

Dr. Deitlein conducted a psychodiagnostic interview on July 22, 2011, and issued a four page report. Tr. 345-49. Dr. Deitlein reviewed documents. Tr. 345. Plaintiff said he had not been able to hold down a job because "my mood swings have gotten me in so much trouble, and he had "been mostly homeless throughout my life." *Id.* Plaintiff had not worked since February 2002, noting "it is hard to keep a job when you cannot show up." Tr. 346.

Plaintiff reported his current medical condition as "chronic pain everywhere. I wonder if I have fibromyalgia." *Id.* In addition he noted diagnoses of diabetes and epilepsy, and headaches and

migraines since a childhood head injury. He took Aleve and Excedrin Migraine regularly. He was first hospitalized at Dammash State Hospital as a teenager after attempting suicide.

He smoked marijuana every two weeks to treat his headaches. Plaintiff reported that after leaving the hospital he was "very drugged up. I worked my way down to pot. I was able to get off of everything once I was on pot. It helped to calm me down and it made me feel mellow." Tr. 346. Plaintiff said he had poor concentration and memory, and rated his depression as three out of ten, and anxiety as five out of ten. Tr. 347. Bipolar symptoms caused significant mood and energy swings. When he is down he has no energy, stays in bed, and has no motivation to accomplish tasks. He feels hopeless and suicidal. During his low phases, Plaintiff's ability to function at work is impaired. Low phases can last a few days or a few weeks.

He enjoys music, playing horse shoes, and watching television. He cleans and cooks. He attends therapy groups a couple of times each week. Dr. Deitlein noted he appeared to be anxious at the beginning of the interview but soon appeared more comfortable. He was oriented to person, place, time and location, but could not name the current Governor or the last three Presidents of the United States. His eye contact was "predominately direct." Tr. 348. Plaintiff was cooperative, his speech was of normal rhythm and rate. Dr. Deitlein noted that "Mr. Hills' predominant and stable mood was reflective of an individual who is depressed." *Id.* His cognitive functioning appeared to be in the normal range. His memory appeared to be intact, and his judgment for a social situation was within normal limits. Dr. Dietlein diagnosed Bipolar Disorder, most recent Depressed; Cannabis Abuse; Alcohol Abuse in full sustained remission; rule out Posttraumatic Stress Disorder, and assessed a GAF of 48. Dr. Dietlein concluded:

/ / /

Today's evaluation revealed that Mr. Hills is able to understand and remember simple and complex instructions, is able to sustain his concentration and attention and is able to persist. He was also able to engage in social interactions successfully. With regards to his mental health issues, if Mr. Hills' bipolar symptoms are successfully treated he would likely be successful vocationally. However, his current physical medical conditions (epilepsy, diabetes and chronic diffuse pain) would also have to be factored in. Mr. Hills' physical conditions should be assessed by a medical provider as his physical conditions are not within the scope of practice for this provider. The combination of Mr. Hills' mental health and physical health conditions could hinder his ability to be successful vocationally.

Tr. 349.

The ALJ noted Dr. Deitlein's opinion and gave it "significant weight." Tr. 22, 24.

**B. John Cochran, Ph.D.**

Dr. Cochran conducted a six-hour long interview and diagnostic testing of Plaintiff on March 14, 2013, and issued a 17 page report. Tr. 501-18. Dr. Cochran reviewed Plaintiff's medical records, including Dr. Deitein's opinion. Plaintiff reported childhood sexual abuse. Tr. 502. He reported working as a dishwasher, and had been fired from two jobs for being too slow. Tr. 505.

Plaintiff reported he had bipolar disorder, and was treated at Dammash State Hospital in 1970 for depression and suicidal ideation. He said he does not always take his bipolar disorder medication. *Id.* He reported chronic pain and speculated whether he had fibromyalgia. Plaintiff had been diagnosed with epilepsy, and had migraine headaches since a childhood head injury.

Plaintiff reported major mood swings with racing thoughts, as well as panic attacks. He noted he was reckless when manic, and he had inherited $100,000 but gave almost all of it away. He becomes grandiose, talkative with pressured speech, and has a reduced need for sleep. When he is depressed he loses interest in everything, has insomnia or hypersomnia, is restless and fatigued.

Page 14 - REPORT and RECOMMENDATION

He feels worthless, wants to avoid people, has suicidal thoughts and has attempted suicide. Tr. 505-06.

Plaintiff has diabetes with intermittent dizziness and irritability. He cannot clearly feel his feet. He has intermittent seizures. Dr. Cochran noted Plaintiff's recent and remote memory appeared to be intact as well as concentration. Tr. 506. Plaintiff said he had been hospitalized three times in the past year for headaches, and had daily anxiety issues. Dr. Cochran reported Plaintiff's judgment was intermittently poor and he had limited insight into his problems. Plaintiff's thought processes were goal directed, logical, relevant, and coherent.

Plaintiff said he last drank alcohol a few days prior to the interview. He used marijuana to soothe his headaches, make him feel better, and help him cope. Plaintiff reported a significant criminal history. Tr. 507.

Dr. Chochran administered the Test of Memory Malingering, the Wechsler Adult Intelligence Scale-Revised, the Minnesota Multiphasic Personality Inventory-2, the Neurobehavioral Cognitive Screening Examination, and the Millon Clinical Multiaxial Inventory-II. Plaintiff demonstrated good effort and motivation, but "was compromised to some extent by anxiety and depression." *Id.* Dr. Cochran noted the test results appeared to be an accurate reflection of his abilities.

Plaintiff's IQ score was 115, in the high average range. Testing indicated Plaintiff was not malingering. Tr. 510. Dr. Cochran stated:

/ / /

/ / /

/ / /

/ / /

Page 15 - REPORT and RECOMMENDATION

On the MMPI-2, his record appears to be valid and interpretable. Larry and others scoring like this often have a somatoform disorder. They tend to be depressed and have anxiety. He tends to be functioning at a reduced level of efficiency. The somatic complaints presented by persons such as this include headaches, chest pain, back pain, and numbness or tremors of the extremities. Other physical complaints include weakness, fatigue, dizziness, and sleep disturbance. The physical symptoms increase in times of stress, and often there is clear secondary gain associated with the symptoms. He scored high on the somatoform scales on both the MMPI-2 and the MCMI-11.

Tr. 511.

Dr. Cochran noted Plaintiff scored high on the anxiety, anger, and depression scales, as well as the low self-esteem, work interference, and negative treatment scales:

Larry and other high scorers on the work interference scale indicates that he has a wide variety of attitudes and behaviors that are likely to contribute to poor work performance such as lacking energy; not being ambitious; feels overwhelmed and unable to cope with stress; feels insecure; often feels like a failure; has a poor self-concept; may obsessively ruminate about his past mistakes; has difficulty making decision; exercises poor judgment; feels anxious, tense, worried, and fearful; feels depressed, sad and hopeless; has a sleep disturbance; and reports somatic symptoms.

The negative treatment indicator scale indicates that he tends to have negative attitudes toward doctors and mental health treatment that thwart treatment such as: may terminate treatment prematurely; feels that no one can understand him; believes that he has problems that he cannot share with anyone; gives up easily when problems are encountered; feels unable to make significant changes in his life; is experiencing intense emotional distress; often report sleep disturbances; frequently reports somatic symptoms; feels depressed, sad, and hopeless; may have suicidal ideation; has low energy levels; often feel anxious and insecure; and is a poor problem solver.

Tr. 512.

On the Millon Clinical Multiaxial Inventory-II, Plaintiff's responses "displayed a tendency toward self-deprecation and a consequent exaggeration of current problems but not to the point that it invalidated the record and made it not interpretable." Tr. 512-13. Dr. Cochran noted Plaintiff scored high on the Bipolar Disorder, Somatoform Disorder, Dysthymic Disorder and Anxiety scales. Tr. 513-14.

Dr. Cochran diagnosed generalized anxiety disorder with panic attacks, dysthymic disorder, bipolar disorder, most recent depressed, somatoform disorder, cannabis abuse, and alcohol abuse in partial remission. Tr. 514. In addition, Dr. Cochran diagnosed personality disorder with avoidant and passive aggressive features, and assessed a GAF of 50.

Dr. Cochran completed a Functional Assessment Form in which he opined Plaintiff had moderately severe limitations in understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods of time; working in coordination or proximity to others without being distracted by them; completing a normal work day without interruptions from psychologically based symptoms and/or completing a normal work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length or rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in a work setting; and setting realistic goals or making plans independent of others. Tr. 517-18.

Dr. Cochran opined Plaintiff would have moderate limitations in remembering locations and work-like procedures; performing activities within a schedule, and/or maintaining regular attendance, and/or being punctual within customary tolerances; sustaining an ordinary routine without special

supervision; interacting with the general public; maintaining socially appropriate behavior and/or adhering to basic standards of neatness and cleanliness; and being aware of normal hazards and taking appropriate precautions. *Id.*

The ALJ noted Dr. Cochran's opinion and stated:

> His opinion regarding the claimant's ability to perform simple routine work activity is consistent with the claimant's performance on mental status examinations. [Citations omitted.] However, his opinion regarding the claimant's inability to concentrate and persist in undermined by the claimant's ability to work as a marijuana "care provider" for a young woman on a weekly basis, which includes spending hours picking up and delivering marijuana. Also, the claimant's ability to spend several hours on the computer daily, as well as read and write short stories, shows that he is capable of concentrating on interested activities. Further, his opinion regarding the claimant's social limitations is significantly weakened by the claimant's actual social functioning that includes providing marijuana for a woman, his ability to attend group therapy sessions, take public transportation, go shopping, and visit good friends. I also note that the claimant gave misinformation to the doctor regarding his marijuana activity rendering Dr. Cochran's opinion about the claimant's functioning less reliable, as he did not have accurate information on which to base his opinion. Accordingly, I give Dr. Cochran's opinion only some weight.

Tr. 25.

The ALJ's reliance on Plaintiff's weekly marijuana delivery as evidence of the ability to concentrate and persist is misplaced. Plaintiff testified that he makes a delivery about once a week, and it takes "just a couple hours." Tr. 56. The ability to take bus rides does not demonstrate the ability to concentrate or persist. In addition, the ability to be on a computer for as much as two hours in a day, and read and write short stories, does not demonstrate the ability to sustain concentration or persist for an eight hour work day. Dr. Cochran's opinion regarding Plaintiff's ability to concentrate and persist is contradicted by Dr. Deitlein, who found Plaintiff could concentrate and

Page 18 - REPORT and RECOMMENDATION

persist. Tr. 349. However, Dr. Chochran's examination of Plaintiff lasted six hours, and included multiple psychological tests not administered by Dr. Deitlein. Dr. Deitlein's examination of Plaintiff was significantly shorter in duration, complexity, and detail.

Moreover, Dr. Cochran's opinion is consistent with the opinion of treating mental health therapist Gailene Thiel, M.S.W., L.C.S.W., Q.M.H.P, of Marion County Mental Health (MCMH). Ms. Thiel saw Plaintiff for mental health counseling at least 13 times between March and October 2011. Ms. Thiel spent more than ten hours with Plaintiff. Tr. 386, 461, 380, 383, 378, 376, 421, 419, 424, 423. On March 8, 2011, Ms. Thiel noted Plaintiff had had mental health treatment off and on since 1967 with five psychiatric hospitalizations. Tr. 386. She diagnosed severe depression, PTSD, uncontrolled Diabetes Mellitus, chronic headaches, and chronic leg pain, with a GAF of 47. Ms. Thiel documented waxing and waning symptoms of depression but ongoing anxiety manifested in rough and raw hands from where Plaintiff bit them. Tr. 462, 380, 378, 359. On May 10, 2011, Ms. Thiel noted Plaintiff was angry and irritable, and needed to pursue social security benefits "which is important in order for him to continue his recovery process." Tr. 420. Between April and July 2011, staff at MCMH assisted Plaintiff in obtaining socks, underwear, and shoes, and supervised him in refilling his pill minder. Tr. In July 2011, Ms. Thiel noted Plaintiff's depression was up and down with difficulties in concentration and memory. Tr. 424. In September 2011, MCMH staff noted Plaintiff needed an advocate when seeing his doctor. Tr. 412, 437.

Plaintiff's temporary housing through MCMH ended on November 30, 2011, and he thereafter moved to Washington. Tr. 463. Plaintiff returned to MCMH on July 2, 2012. Plaintiff had been off his medication since February, and said he would commit suicide on July 26 unless he received his medication. *Id.* Julia Ray, QMHP, noted rapid speech, fair to poor insight and

Page 19 - REPORT and RECOMMENDATION

judgment, and anxiety with the inability to remain seated. Tr. 465. Ms. Ray made the provisional diagnosis of Bipolar Disorder NOS and assessed a GAF of 50. Tr. 466.

Dr. Cochran's opinion is consistent with the opinion of Patrick A. Wade, C.A.D.C.H.,[1] Tr. 305-22. Mr. Wade conducted a Multi-Axial Assessment of Plaintiff between April 14 and 18, 2011, for Bridgeway Recovery Services. Plaintiff reported a history of alcohol and marijuana abuse. Mr. Wade's provisional diagnosis was cannabis abuse and alcohol abuse in full remission. Tr. 307. Plaintiff's hygiene was poor, as was his ability to pay attention, his judgment was impaired, insight limited, and thought process tangential. Tr. 314. Mr. Wade noted diagnoses of Bipolar I disorder, most recent episode depressed, severe, and panic disorder. Tr. 321. On April 19, 2011, Elizabeth Roberts, M.S., a Bridgeway employee, reported Plaintiff was "easily distracted" from the group topic and claimed to have a bad headache. Tr. 335. On May 18, 2011, Mr. Wade noted a tangential thought process and recommended Plaintiff attend two group therapy sessions each week as well as individual counseling twice a month. Tr. 328.

On this record, the ALJ's determination to accept Dr. Deitlein and reject Dr. Chochran is not supported by specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632.

Dr. Cochran found Plaintiff had moderately severe limitations in social functioning. Tr. 517-18. The ALJ noted this opinion, and found it contradicted by Plaintiff's actual social activities, including his weekly marijuana delivery, his ability to attend group therapy sessions, take public transportation, go shopping, and visit friends. Tr. 25. It is not fair to characterize Plaintiff's attendance at a medically prescribed mental health group therapy session as a "social function."

---

[1]Mr. Wade has an additional professional qualification but it is illegible. Tr. 322.

On this record, the ALJ failed to identify specific and legitimate or clear and convincing reasons to reject Dr. Cochran's opinion that Plaintiff had moderately severe limitations in multiple functional dimensions, as well as moderate limitations in multiple functional dimensions. Tr. 517-18.

## III. Headaches

Plaintiff contends the ALJ failed adequately to consider absenteeism arising from his headaches. Plaintiff testified that he has headaches that can last a couple of days. Tr. 51. The ALJ relied on the evidence of Plaintiff's activities of daily living and Plaintiff's report that marijuana helped his headaches. Tr. 18, 21, 22, 24, 53. As set out above, the ALJ properly found Plaintiff less than fully credible and Plaintiff failed to meet his burden of showing his alleged headaches had more than a minimal effect on his ability to do work activities.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011)(quoting *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart,* 340 F.3d 871, 876 (citing *Bunnell v. Sullivan,* 947 F.2d 871(9th Cir. 2003)(en banc)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

The ALJ's rejection of Dr. Cochran's opinion is erroneous for the reasons set out above. The Vocational Expert testified that, if Dr. Cochran's opinion is credited, Plaintiff would be unable to maintain employment. Tr. 89.

Accordingly, this matter should be remanded for the calculation and award of benefits.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## RECOMMENDATION

For the foregoing reasons, the Commissioner's final decision should be **REVERSED** and this matter should be **REMANDED** for the calculation and payment of benefits.

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See,* FED.R.CIV.P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir. 1991).

Dated this _10_ day of December, 2015.

Mark D. Clarke
United States Magistrate Judge